**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| CHINYERE UDEH | * | |
| 2117 Jubilee Court | | |
| Baltimore, Maryland 21214 | * | |
| | | |
| *Plaintiff* | * | Civil Action No. 1:20-cv-3745 |
| | | |
| v. | * | |
| | | |
| MARYLAND DEPARTMENT OF | * | |
| PUBLIC SAFETY AND | | |
| CORRECTIONAL SERVICES | * | |
| 300 East Joppa Road, Suite 1000 | | |
| Towson, Maryland 21286 | * | |
| | | |
| *Defendant* | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Chinyere Udeh (hereinafter "Plaintiff," or "Ms. Udeh"), by and through counsel, Bruce M. Luchansky AND LUCHANSKY LAW, files this Original Complaint and Jury Demand against Defendant Maryland Department of Public Safety and Correctional Services (hereinafter "Defendant," or "DPSCS") and states the following in support thereof.

## INTRODUCTION

1.      This is an employment discrimination case, brought pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and violations of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2008 (the "ADA"). Plaintiff alleges the Defendant engaged in a practice of employment discrimination on the basis of her national origin, and the Defendant then retaliated against her when she reported this discrimination. Plaintiff also alleges that Defendant discriminated against her based on a

perceived disability that the Defendant manufactured by baselessly questioning Plaintiff's mental health status, and then relentlessly requiring Plaintiff to submit to fitness-for-duty evaluations. Not only did the Defendant unlawfully discriminate against Plaintiff by requiring her to submit to these examinations, which were conducted incorrectly and produced inaccurate conclusions that were unreliable on their face, but the Defendant further discriminated against Plaintiff by discharging the Plaintiff on the basis of this perceived disability. Because of its discriminatory animus, the Defendant also withheld and failed to pay Plaintiff wages that were due and owing at the time of her discharge. This action seeks back pay, lost wages, unpaid wages and accrued leave, compensatory damages, punitive damages, expert witness fees, attorney's fees and costs, and pre-judgment and post-judgment interest for Defendants' employment discrimination against Plaintiff and willful discharge, suffered by Plaintiff in the course of her employment with Defendant.

2.     Plaintiff demands a jury trial on all issues triable to a jury.

### PARTIES

3.      Plaintiff Chinyere Udeh is a resident of Baltimore City, Maryland.

4.     Ms. Udeh was born in Nigeria and immigrated to the United States and became a U.S. citizen.

5.     Ms. Udeh obtained her high school diploma and several advanced degrees including a master's degree in Homeland Security.

6.     Defendant Department of Public Safety and Correctional Services is the Maryland state agency responsible for the operation of the state's prisons and pre-release centers. DPSCS has nearly 12,000 employees.

7.     At all times since December 1, 2014, the Defendant has been an employer within the meaning of Title VII and the ADA.

8.     Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that Defendants' wardens, officers, director, agents, servants, supervisors, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendants or was done in the routine and normal course and scope of employment of Defendants' wardens, officers, director, agents, servants, supervisors or employees.

## JURISDICTION & VENUE

9.     This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").  This Court has jurisdiction under 42 U.S.C. § 2000e-5(f).

10.     This action also arises under the Americans with Disabilities Act, 42 U.S.C. §§12111 *et seq.,* as amended by the ADA Amendments Act of 2008.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 (Federal Question).

12.     The Court has personal jurisdiction over Defendant since Defendant is a state agency, employs employees in Maryland, and regularly conducts business in Maryland.

13.     Moreover, the acts about which Plaintiff complains occurred within the State of Maryland.

14.     Venue is proper in the Court pursuant to 28 U.S.C. § 1391(b) because Defendant regularly conducts business in Maryland, Defendant is a state agency, and the acts and conduct charged herein occurred within this District.

15.     This Court has jurisdiction over all claims in this action.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16.     Plaintiff filed a Charge of Discrimination ("Charge") with the Maryland Commission on Civil Rights ("MCCR") on July 7, 2018 that included charges of national origin discrimination, disability discrimination, and retaliation.

17.     The Charge was filed within 180 days of the discriminatory employment practices described in this Complaint.

18.     Plaintiff subsequently supplemented her charges to include later discriminatory actions taken by Defendant, including discharging Plaintiff.

19.     Plaintiff received a written finding dated April 3, 2020 from the MCCR which found no probable cause.

20.     Plaintiff asked for a reconsideration of the written finding on April 7, 2020.

21.     On May 8, 2020, Plaintiff's request for reconsideration was denied by MCCR.

22.     A Dismissal and Notice of Rights from the Equal Employment Opportunity Commission ("EEOC") was mailed to Plaintiff on September 28, 2020 and is attached hereto as Exhibit A.

23.     Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## FACTS

24.     Defendant is a Maryland state agency whose mission is to protect the public, its employees, and detainees and offenders under its supervision.

25.     Plaintiff was employed by Defendant from December 1, 2014 until June 22, 2019, when she was discharged.

26.     Plaintiff was employed on a full-time basis as a Correctional Officer II after a non-competitive promotion from Correctional Officer I after one year of successful employment.

27.     Plaintiff's job responsibilities included supervising inmates in correctional facilities.

28.     On or about June 2015, Plaintiff began experiencing harassment by coworkers and supervisors because of her national origin by derogatory comments such as "African bitch" and "Go back to Africa" and false allegations that Plaintiff flirts with inmates.

29.     Plaintiff spoke with other African coworkers who told her "just manage it, because they pick on all of us, and there's nothing you can do about it."

30.     Plaintiff's coworkers teased her and formed a clique against her, and she reported the behaviors.

31.     On May 30, 2017, Plaintiff was assaulted by an ex-inmate when he threw food on her in the parking lot by the correctional facility.

32.     Plaintiff was able to get away from the inmate by getting in her car and returning to the facility and reporting the incident.

33.     While the police responded, and an internal investigation was supposed to be completed, no further action occurred.

34.     On July 6, 2017, Plaintiff saw Officer Dukes violate regulations and reported the officer to a supervisor.

35.     Plaintiff's supervisor instructed her to write a report, but Plaintiff was concerned about submitting the report knowing that she would be picked on after it was filed.

36.     On July 19, 2017, Plaintiff reported an incident to Major Faison about Officer Dukes and two other coworkers getting inmates to act up and become unruly around Plaintiff.

37.     Officer Dukes and Officer P. Williams asked her to deny her report but she refused.

38.     On July 27, 2017, Officer P. Williams approached Plaintiff at her station and displayed animosity toward her by accusing her of flirting with an inmate.

39.     Plaintiff reported this incident which resulted in other officers supporting the hostility toward her.

40.     With each complaint, the persecutions increased against Plaintiff, including refusing to allow her to provide briefing on events of her shift, refusing to sit on the chair Plaintiff sat on, and other hostile mannerisms towards Plaintiff.

41.     On December 19, 2017, coworkers left a death threat for Plaintiff in Major James Faison's mailbox which stated "We will kill that bitch Youday if y'all keep putting her over here. Real Shit.  Keep away.  She keep trying to eat people's dicks."

42.     Plaintiff was asked by management to sign a letter stating she did not feel threatened, but she refused to sign the letter.

43.     After her refusal to sign the letter, Plaintiff was excluded from the Officer's roll call and prohibited from entering the Officer Dining Room.

44.     On or about December 31, 2017, Captain Jones prevented Plaintiff from working in the Master Control Post and made derogatory comments stating that Plaintiff needs to change her handwriting and the way she spoke and criticized everything she did.

45.     Captain Jones also prevented Plaintiff from bringing items to work that other officers were allowed to bring such as lip balm and hand cream.

46.     Plaintiff reported her treatment to Assistant Warden Christopher Smith on January 2, 2018 via email.

47.     Assistant Warden Christopher Smith replied via email on January 3, 2018 directing Plaintiff to address future concerns with her supervisor via the chain of command despite acknowledging the threat on Plaintiff's life and discriminatory treatment.

48.     On January 12, 2018, Plaintiff filed a discrimination complaint with Defendant's EEO Office.

49.     On January 31, 2018, Plaintiff felt overwhelmed and stressed and lost consciousness at work.

50.     Plaintiff was then taken to the Mercy Hospital Emergency Room for medical treatment and was released.

51.     Plaintiff was subsequently transferred from Baltimore City Correctional Center to Maryland Reception, Diagnostic, and Classification Center ("MRDCC").

52.     On February 2, 2018, Plaintiff went back to work and was again picked on by coworkers and verbally harassed because of her national origin.

53.     On February 15, 2018 Plaintiff felt overwhelmed and began having headaches and neck pain due to her workplace harassment.

54.     Plaintiff sought medical treatment at Mercy Hospital Emergency Room again due to the workplace harassment and was released.

55.     On February 20, 2018, Warden Tina Stump ordered Plaintiff to submit to a fitness-for-duty evaluation with the State Medical Director's Office.   Plaintiff was placed on administrative leave pending the results of the fitness-for-duty-evaluation.

56.     On February 28, 2018, Plaintiff reported to Dr. Ifeanyi Nwaneshiudu, an occupational medicine physician at the State Medical Director's Office, for a fitness-for-duty-evaluation, as she was ordered to do.  According to Dr. Nwaneshiudu's report, Plaintiff had been

"sent for a workability evaluation for concerns about her mental health status due to erratic behavior." Plaintiff had not been exhibiting erratic behavior, and this representation to the State Medical Director's Office was false. Nevertheless, by means of this representation, the Defendant successfully conveyed to the State Medical Director's Office the outcome it was seeking – which was to declare Plaintiff unfit for work because of her mental health.

57.     Dr. Nwaneshiudu got the message. Despite making objective determinations that Plaintiff was physically healthy ("On physical examination, there were no functional deficits noted") and mentally competent ("her mental status examination was normal"), he prohibited Plaintiff from going back to work and ordered her for a psychiatric evaluation. Despite noting the normal results of Plaintiff's mental status evaluation and the fact that Plaintiff denied any thoughts of violence towards anyone at work, Dr. Nwaneshiudu claims he had "concerns about her mental health status, and will refer her for a psychiatric evaluation to evaluate her mental health stability and any potential for workplace violence."

58.     On April 2, 2018, Plaintiff reported as ordered for a psychological evaluation by Dr. Gabriel Newman, a licensed psychologist, to whom she was referred by the State Medical Director's Office. Dr. Newman performed a variety of tests including achievement testing during this evaluation.

59.     Dr. Newman reports that Plaintiff was referred for a general psychological evaluation "to assess her intellectual, emotional, personality and behavioral status with respect to fitness for work." This comprehensive assessment far exceeds the scope of the assessment that Dr. Nwaneshiudu claimed in his report he was referring Plaintiff to receive – an assessment that Plaintiff contends was not indicated to be necessary in the first place. But the assessment that Dr. Newman performed went way beyond the scope of Dr. Nwaneshiudu's referral.

60.     Moreover, the tests that Dr. Newman administered were incorrect tools for performing the assessment of the Plaintiff that Dr. Nwaneshiudu claimed to be seeking.

61.     However, like Dr. Nwaneshiudu before him, Dr. Newman understood that the objective was to disqualify Plaintiff from returning to work.  Consequently, that is the conclusion that he made sure to draw from the examination.

62.     Dr. Newman's behavioral observations of Plaintiff indicated that Plaintiff was a perfectly normal and healthy individual.  According to Dr. Newman's own observations, Plaintiff was on time, with appropriate attire and well-maintained hygiene.  She had appropriate affect, good eye contact, and her responses were relevant and focused.  While testing, Plaintiff was relevant and focused, cooperated with the requirements of the evaluation, and engaged in the 4 hours of testing without excessive tiring or loss of focus.  There was no indication of psychotic thought process, delusional or hallucinatory thinking, no instances of paraphasia or agnosia, no notable signs of perseverative or compulsive thinking or behavior.  There were no notable signs of depressive, anxious, hypomanic, or manic behaviors.

63.     Yet, Dr. Newman claims that the tests he administered to Plaintiff demonstrated that she is functioning on an elementary school level of intelligence in mathematics, word reading, and spelling, and at a junior high level in sentence comprehension.

64.     Dr. Newman diagnosed Plaintiff as having Borderline Intellectual Functioning with intellectual disabilities.  Dr. Newman does not explain how his conclusions are consistent with Plaintiff's having graduated from high school, obtained an Associates Degree in Law Enforcement and Correctional Administration, attained a Bachelors Degree in Criminal Justice with certification in Forensic Sciences, and achieved (at the time) 36 credits in her present pursuit of a Masters Degree in Homeland Security at American University (which she went on to obtain).

65.     Furthermore, Dr. Newman did not explain how – even if his IQ results were accurate (which they were not) – Plaintiff's IQ was relevant to an assessment of her mental health status, which was the manufactured reason Plaintiff was referred for evaluation in the first place.

66.     Despite Dr. Newman's express recognition of Plaintiff's stable mental status, Dr. Newman reached the conclusion that clearly was expected of him – that although "Ms. Udeh would like to continue her work in the corrections field, however, it is suspected that she would not contend well with the challenges of this work."

67.     Dr. Nwaneshiudu and Dr. Newman engaged in classic prohibited conduct.  They chose to blame the victim of discrimination, an employee brave enough to report a hostile work environment, and refuse to return her to her position simply because she was suffering from the stress of being unlawfully bullied.  The evidence available to the Defendant and its agents was that the Plaintiff was perfectly capable of performing her job if the perpetrators of her abuse simply were compelled to stop their harassment.  Instead, the Defendant continued to punish the Plaintiff.

68.     Plaintiff denies that Dr. Newman's test results are accurate.  He utilized tests that were inappropriate for the purpose of Plaintiff's evaluation – which was not legally justified to begin with – and the results suggesting that Plaintiff had intellectual disabilities and an elementary school level IQ are false.  Plaintiff does not have Borderline Intelligence Functioning.

69.     On April 23, 2018, Plaintiff was informed via email that she had been placed into the "Better Qualified" category for the job position of Correctional Case Management Specialist Trainee she previously applied to.

70.     Although Plaintiff qualified for the middle tier of candidates, Plaintiff did not get an interview for this position.

71.    Warden Stump told Plaintiff that she would never be a case manager because she is "crazy."

72.    Plaintiff was not paid a $750 bonus given to all other correctional officers on May 16, 2018.

73.    On June 6, 2018, Plaintiff was transferred to the Chesapeake Detention Facility.

74.    While at Chesapeake Detention Facility, Plaintiff was harassed and threatened by staff.

75.    Plaintiff was then transferred to the Jail Industries Building with the help of Warden Alexander for a project manager position.

76.    On or about November 1, 2018, to about January 11, 2019, Plaintiff was continually harassed by Major Tripp stating "You don't belong here" while working in the medical department at the Jail Industries Building.

77.    Major Tripp then intentionally reassigned Plaintiff back to an undesirable work location (the Chesapeake Detention Facility).

78.    On January 11, 2019, Plaintiff was advised she was being returned to Chesapeake Detention Facility by Warden Michelle Pacheco.

79.    Plaintiff reported that she feared for her safety at this location.

80.    Plaintiff then attempted to meet with Deputy Commissioner Michael King in person about her concerns.

81.    She was not allowed to meet with the Deputy Commissioner despite requesting an in-person meeting when she went to his office.

82.    Plaintiff was accused of threatening Deputy Commissioner King.

83.     Plaintiff denies any such allegation.  On the contrary, she was attempting to seek out help for her safety concerns.

84.     As a direct result of her attempt to meet with the Deputy Commissioner on January 11, 2019, Plaintiff was placed on paid administrative leave by Warden Micelle Pacheco and ordered to complete another workability evaluation.

85.     No justification was provided for ordering Plaintiff to undergo yet another workability examination.

86.     No legal justification existed for ordering Plaintiff to undergo yet another workability examination.  This act represented one more attempt to characterize Plaintiff as disabled and unable to perform the essential duties of her position, as well as discriminate against her on the basis of her national origin and retaliate against her for reporting her unlawful treatment.

87.     On April 24, 2019, Plaintiff's own health care provider performed a physical workability evaluation and determined that she could perform all work-related tasks.  The health care provider concluded: "Patient does not require restrictions."

88.     Nevertheless, on April 25, 2019, Plaintiff was forced to complete another workability examination by the State Medical Director's office.  Dr. Michael Williams issued a report on May 2, 2019, recording his assessment and findings.

89.     Dr. Williams' report is absurd.  Like Dr. Nwaneshiudu and Dr. Newman before him, Dr. Williams found absolutely nothing wrong with Plaintiff's physical or mental health.  She felt fine.  She did not smoke or use drugs.  "Her review of systems was unremarkable."  Plaintiff "was alert and oriented x 3."  "She showed no signs of physical or emotional distress throughout the evaluation today."  The only problem was that Plaintiff feels the "bullying continued at her new location."  Based entirely on the written record that was given to him – which Plaintiff sharply

disputes -- Dr. Williams concluded that Plaintiff "is unable to safely, consistently, and reliably perform her essential job duties with or without reasonable accommodations at this time." Dr. Williams referred Plaintiff for yet another Independent Psychological Evaluation (IPE).

90.     Dr. Williams' conclusion and recommendation is ludicrous and constitutes further unlawful discrimination and retaliation against Plaintiff. All Plaintiff did was to have the temerity to report harassment based on her national origin. Since that time, DPSCS remained unrelenting in its efforts to blame the victim, marginalize Plaintiff, and characterize her as mentally and emotionally unstable. If this were a Hollywood script, it would be entertaining. Given that it is the life of a real individual who was being destroyed professionally, it is tragic.

91.     On May 3, 2019, Plaintiff was forced to report to psychologist Dr. Patricia Jenkins for a Psychological Evaluation "to aid in determining her ability to perform the duties of her position as a Correctional Officer for the Maryland Department of Public Safety and Correctional Services." The only justification for the referral was that, "The referral indicated that Ms. Udeh's employer has concerns regarding her job performance."

92.     Dr. Jenkins concluded that Plaintiff was normal. "Ms. Udeh's personality structure is intact and reasonably well adjusted. She shows capacity for empathy, concern for others, respect for the rights of others, close family ties, and positive outlook on life overall. The only problem was that Plaintiff was dealing with "job-related stress and worry" because "she was being bullied on her job and treated unfairly."

93.     Dr. Jenkins found Plaintiff should receive therapy and should be transferred to another work location. "Her mental health and subsequently her job performance would be compromised if she returns to the same work setting with exposure to recurring stressors."

94.     Despite these findings, the Defendant still did not perform the investigation required upon a report of bullying and harassment based on a protected classification, but instead continued its efforts to retaliate against a qualified employee who had reported a civil rights violation.

95.     Defendant continued its harassment of the Plaintiff through never-ending, unnecessary, and unjustified medical evaluations.

96.     On May 23, 2019, the Plaintiff was compelled to return to Dr. Michael Williams in follow-up to his April 25, 2019 evaluation, and after Dr. Jenkins' May 3, 2019 psychological evaluation.

97.     Once again, Dr. Williams found Plaintiff's mental status examination to be perfectly normal: "The mental status evaluation today was unremarkable.  Her appearance was appropriate.  Her speech was coherent.  Her affect was appropriate and her mood was euthymic [*i.e.,* normal, tranquil].  Her thought processes were logical.  There were no obvious deficits in her short-term or long-term memory.  She denied any auditory or visual hallucinations or delusions. She also denied any suicidal or homicidal ideation."

98.     Nevertheless, Dr. Williams concluded that Plaintiff suffered from "adjustment disorder with depressed mood," and he found Plaintiff unable to perform her job duties.  Once again, Dr. Williams based his opinion entirely on a written record – including allegations that Plaintiff disputes -- without even acknowledging Dr. Jenkins's recommendation that Plaintiff would benefit from therapy because of the bullying she had been experiencing.

99.     Plaintiff believes and alleges that Dr. Williams simply was acting as an administrative extension of the Defendant, seeking to provide cover for the personnel action that the DPSCS wanted him to provide – namely, justification for firing the Plaintiff.  Dr. Williams

willingly complied.  Clearly stepping outside the bounds of his role as an alleged Independent Medical Examiner, Dr. Williams went so far as to make a (barely) veiled recommendation that Plaintiff be fired.  "[I]t is my opinion that Ms. Udeh is unable to safely, consistently, and reliably perform her essential job duties with or without reasonable accommodations in the near or foreseeable future.  It is therefore my recommendation that the agency take the appropriate administrative actions concerning her employment status as a Correctional Officer II."

100.    On June 4, 2019, Plaintiff was banned from all correctional facilities via a poster with her photograph, causing the Plaintiff to suffer great humiliation.

101.    On June 20, 2019, Secretary Robert Green terminated Plaintiff's employment with DPSCS, effective June 22, 2019.  The reason given in support of the decision specifically was Dr. Williams' personnel (non-medical) recommendation set forth above, that the "agency take appropriate administrative actions concerning her employment status as a Correctional Officer II."

102.    Dr. Williams had provided the cover that the Defendant was seeking.  Rather than address the Plaintiff's meritorious complaints of being the victim of unlawful workplace harassment on account of her national origin, the Defendant proceeded to retaliate against the Plaintiff and falsely perceive her as an individual with a disability – and then fire her because of the false perception DPSCS created.

103.    Defendant's unlawful conduct caused Plaintiff substantial personal and professional harm, including her termination of employment, the inability to find employment for a substantial period of time and eventually forcing Plaintiff to accept underemployment when eventually offered to her.  Plaintiff also suffered severe humiliation and emotional suffering as a result of the Defendant's unlawful conduct.  Moreover, Defendant has failed and refused to pay the Plaintiff unpaid wages and accrued paid leave.

## COUNT I
### NATIONAL ORIGIN-BASED DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, *AS AMENDED*, 42 U.S.C.A. §§ 2000E *ET SEQ.*

104.    Plaintiff hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

105.    Section 703 of Title VII prohibits employment practices that discriminate against persons on the basis of their nation origin.

106.    Plaintiff was subjected to harassment by Defendant's agents and employees because of her national origin.

107.    Plaintiff was subjected to verbal and written misconduct, harassment, and bullying by Defendant through its agents and employees.

108.    Defendant's conduct was not welcomed by Plaintiff.

109.    Defendant's conduct was undertaken because of Plaintiff's national origin, African (Nigerian).

110.    The conduct was so severe that reasonable persons in Plaintiff's position would find their work environment to be hostile or abusive.

111.    Plaintiff believed her work environment to be hostile or abusive as a result of Defendants' conduct, and she reported the conduct, requested that action be taken to prevent such harassment, and expressed fear for her safety.

112.    Management level employees knew of the abusive conduct.  Plaintiff provided management level personnel with information sufficient to raise a probability of national origin harassment in the mind of a reasonable employer.  The harassment was so pervasive and management level employees were themselves complicit in the abusive conduct.

113.    Defendant was obligated to undertake a thorough investigation of Plaintiff's complaints of national origin discrimination.

114.    Defendant failed to perform a thorough investigation of Plaintiff's complaints of national origin discrimination.

115.    Defendant failed to take any action to protect Plaintiff from the national origin discrimination she experienced and failed to discipline the perpetrators or otherwise cause such behavior to end.

116.    Instead, Defendant undertook a series of actions to perpetuate the discriminatory treatment of Plaintiff and ultimately discharged her.

117.    As the direct and proximate result of the Defendant's discrimination, Plaintiff has suffered significant damages in an amount to be proven at trial.

118.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on national origin.

119.    Pursuant to Title VII, Defendant is liable to Plaintiff for back wages, compensatory damages, lost wages, unpaid wages and accrued leave, punitive damages, plus reasonable attorneys' fees, pre- and post- judgment interest, fees, and costs, in an amount equal to at least $500,000.

**WHEREFORE**, Plaintiff respectfully demands that this Court enter a judgment awarding Plaintiff:

a.      Back pay, front pay, lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions in an amount to be proven at trial;

b.      Compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

c.      Punitive damages in an amount to be proven at trial;

d.      Unpaid wages and accrued paid leave;

e.      Interest on lost wages, compensation, and damages, including pre- and post-judgment interest;

f.      Reasonable attorneys' fees and costs incurred in pursuing this action; and

g.      Such other and further relief as this Court deems necessary and proper.

## COUNT II
### PERCEIVED DISABILITY DISCRIMINATION
### AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. 12181 *ET. SEQ.*

120.    Plaintiff hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

121.    In February 2018, the Defendant undertook and expressed an unsubstantiated and incorrect perception that the Plaintiff suffered from mental health issues that prevented Plaintiff from performing her job.

122.    Based on this false perception, the Defendant undertook a campaign to establish a written record to reinforce this narrative.

123.    The Defendant ordered the Plaintiff to undergo a series of physical and mental health evaluations without legal justification and in violation of Plaintiff's rights.

124.    Defendant's perception of the Plaintiff as an individual who suffered from mental health disabilities that prevented Plaintiff from performing the essential duties of her job with or without a reasonable accommodation rendered Plaintiff a "qualified individual with a disability" within the meaning of 42 U.S.C.A. § 12111 of the ADA.

125. Plaintiff denies the validity of the evaluations performed and denies that she suffered from a disability that rendered her unable to perform the essential duties of her job with or without a reasonable accommodation.

126. Nevertheless, Defendant perceived Plaintiff to be disabled from this time forward and discriminated against Plaintiff on the basis of this perceived disability, eventually firing her for it.

127. Defendant's unlawful actions were intentional, malicious, and/or done with reckless disregard to Plaintiff's rights under the ADA.

128. Plaintiff suffered damages as a result of Defendant's unlawful discriminatory perception, including back pay, front pay, lost wages, emotional distress, unpaid wages and accrued leave, attorneys' fees, and the other costs of bringing this action, in an amount to be proven at trial but at least equal to $500,000.

**WHEREFORE**, Plaintiff respectfully demands that this Court enter a judgment awarding Plaintiff:

a. Back pay, front pay, lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions in an amount to be proven at trial;

b. Compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

c. Punitive damages in an amount to be proven at trial;

d. Unpaid wages and accrued paid leave;

e. Interest on lost wages, compensation, and damages, including pre- and post-judgment interest;

f. Reasonable attorneys' fees and costs incurred in pursuing this action; and

g.      Such other and further relief as this Court deems necessary and proper.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, *AS AMENDED*,**
**42 U.S.C. § 2000E-3(A)**

129.    Plaintiff hereby incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

130.    Section 704(a) of Title VII prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. 2000e-3(a).

131.    Plaintiff made formal complaints to Defendant opposing Defendant's unlawful, discriminatory employment practices based on national origin.

132.    As a result of Plaintiff's complaints, Defendant took materially adverse actions against Plaintiff, including, but not limited to, moving Plaintiff to other facilities, forcing Plaintiff to complete fitness for duty tests, and terminating her employment.

133.    Defendant's adverse actions constituted retaliatory workplace harassment.

134.    Defendant's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

135.    Defendant's actions were taken with willful disregard for the rights of Plaintiff under Title VII.

136.    As a direct, legal, and proximate result of Defendants' retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial, but equal to at least $500,000.

137.    Plaintiff is entitled to reasonable attorney's fees and costs of suit.

**WHEREFORE**, Plaintiff respectfully demands that this Court enter a judgment awarding Plaintiff:

a.      Back pay, front pay, lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions in an amount to be proven at trial;

b.      Compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

c.      Punitive damages in an amount to be proven at trial;

d.      Unpaid wages and accrued paid leave;

e.      Interest on lost wages, compensation, and damages, including pre- and post-judgment interest;

f.      Reasonable attorneys' fees and costs incurred in pursuing this action; and

g.      Such other and further relief as this Court deems necessary and proper.

### JURY DEMAND

138.    Plaintiff demands a trial by jury on all issues triable to a jury.

Respectfully submitted,


_____/s/Bruce M. Luchansky_____
Bruce M. Luchansky (Fed. Bar No. 08439)
 lucky@luchanskylaw.com
**LUCHANSKY LAW**
606 Bosley Ave., Suite 3B
Towson, Maryland 21204
Telephone: (410) 522-1020
Facsimile: (410) 522-1021

*Attorneys for Plaintiff*