# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **CHINYERE UDEH,** | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-20-3745 |
| **MARYLAND DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES,** | * * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On December 25, 2020, Plaintiff Chinyere Udeh ("Plaintiff" or "Udeh") filed this civil action against her former employer Defendant Maryland Department of Public Safety and Correctional Services ("Defendant" or "DPSCS") seeking damages and other legal relief for the Defendant's alleged violation of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000, *et. seq.* (ECF No. 1). On March 1, 2021, Defendant filed a Motion to Dismiss for Failure to State a Claim and Lack of Jurisdiction. (ECF No. 10.)[1] In the now operative Amended Complaint (ECF No. 13), Plaintiff asserts claims for National Origin-Based Discrimination (Count I) and Retaliation (Count II). (*Id.*) Presently pending is Defendant DPSCS's Motion to Dismiss the Amended Complaint for Failure to State a Claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Lack of Jurisdiction

---

[1] Since Plaintiff has since amended her Complaint, Defendant's Motion to Dismiss the Original Complaint (ECF No. 10) is DENIED AS MOOT.

1

pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (ECF No. 16.) The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, the Defendant's Motion (ECF No. 16), construed in its entirety as a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is DENIED.

## BACKGROUND

This Court accepts as true the facts alleged in the Plaintiff's Amended Complaint (ECF No. 13). *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011). The Plaintiff Udeh was born in Nigeria and immigrated to the United States. (ECF No. 13 ¶ 4.) She is now a naturalized American citizen and currently resides in Baltimore, Maryland. (*Id.* ¶¶ 3-4.) Plaintiff was an employee of the Defendant, Maryland Department of Public Safety and Correctional Services ("DPSCS"), from December 1, 2014 until June 22, 2019, when she was discharged. (*Id.* ¶ 24.) At DPSCS, Udeh worked on a full-time basis as a Correctional Officer II, supervising inmates in correctional facilities. (*Id.* ¶¶ 25-26.) She alleges that starting in June 2015 and continuing for three-and-a-half-years, she experienced harassment by coworkers and supervisors within DPSCS because of her national origin. (*Id.* ¶ 27.) Plaintiff alleges that coworkers and supervisors made derogatory comments towards her, such as calling her an "African bitch," telling her to "Go back to Africa," and saying "Y'all Africans came from your country to steal our jobs here in America." (*Id.*) She also alleges that she was the target of false allegations from coworkers and supervisors that she flirts with inmates, a serious violation of employee protocols. (*Id.* ¶ 28.) She alleges that these false allegations were used as a pretext to remove her from DPSCS due to her national origin. (*Id.*)

Udeh spoke about her harassment with other coworkers from African countries including Nigeria, who told her that this pattern and practice was widely accepted throughout DPSCS. (*Id.* ¶ 29.) Her African colleagues also suggested she "just manage it, because they pick on all of us and there's nothing you can do about it" and that she should remember she is just a visitor in America. (*Id.*) Udeh generally alleges that her American coworkers teased her and formed a clique against her and that she reported such behaviors. (*Id.* ¶ 30.)

On May 30, 2017, Plaintiff was assaulted by an ex-inmate when he threw food on her in the parking lot by the correctional facility. (*Id.* ¶ 31.) Udeh was able to get away from the inmate by getting in her car, returning to the facility, and reporting the incident. (*Id.* ¶ 32.) As a result of this incident, the Internal Investigative Unit of DPSCS was supposed to complete an internal investigation, but Udeh alleges that no further action was taken. (*Id.* ¶ 33.)

On July 6, 2017, Plaintiff saw Officer Dukes violate regulations and reported the officer to a supervisor. (*Id.* ¶ 34.) Although her supervisor instructed her to write a report on the incident, Udeh was concerned about submitting the report knowing that she would be "picked up" after the report was filed. (*Id.* ¶ 35.) Plaintiff subsequently reported another incident about Officer Dukes and two other coworkers getting inmates to act up and become unruly around her. (*Id.* ¶¶ 36-37.) Officers Dukes and Williams asked Plaintiff to deny such report, but she refused, after which Officer Williams approached Udeh at her station and displayed animosity toward her by accusing her of flirting with an inmate. (*Id.* ¶¶ 36-38.) Plaintiff subsequently reported this incident, which resulted in other officers supporting the hostility towards her. (*Id.* ¶ 40.) Udeh alleges that with each complaint, the "persecutions" increased against her. She

3

was not allowed to provide briefings on the events of her shift, fellow employees refused to sit on the chair with her, and fellow employees were otherwise hostile toward her. (*Id.* ¶ 40.)

On December 19, 2017, coworkers left a note directed at Udeh in Major James Faison's mailbox, which was located in a place that only her coworkers could access. (*Id.* ¶ 41.) The note said, "[w]e will kill that bitch Youday if y'all keep putting her over here. Real Shit. Keep away. She keep trying to eat people's dicks." (*Id.*) Plaintiff was asked by management to sign a letter stating she did not feel threatened, but she refused to sign the letter and was then excluded from the Officer's roll call and prohibited from entering the Officer Dining room. (*Id.* ¶¶ 42-43).

Around December 31, 2017, Captain Jones prevented Plaintiff from working in the Master Control Post and stated that she needed to change her handwriting and the way she spoke, criticizing her for not being "American enough." (*Id.* ¶¶ 44-45.) On January 2, 2018, Udeh reported her treatment to Assistant Warden Christopher Smith, and then on January 12, 2018, she filed a discrimination complaint with Defendant's Equal Employment Opportunity ("EEO") office. (*Id.* ¶¶ 46-47.) On January 31, 2018, after receiving a response from Assistant Warden Smith instructing her to address future concerns via the chain of command, Plaintiff reports that she felt overwhelmed and stressed, lost consciousness, and was taken to Mercy Hospital. (*Id.* ¶¶ 48-50.) Plaintiff was subsequently transferred to a new work location, the Maryland Reception, Diagnostic, and Classification Center ("MRDCC") where she alleges she was again harassed by her coworkers because of her national origin and told that she was "crazy." (*Id.* ¶¶ 51-52.) Although Plaintiff reported this behavior to Assistant Warden Smith, he replied "[w]ell, that's not what your kind told me. They told me that you are the one causing

4

the problem." (*Id.* ¶ 53.) After no action was taken, Plaintiff alleges that she again felt overwhelmed and began having headaches and neck pain due to her workplace harassment and sought treatment at Mercy Hospital. (*Id.* ¶¶ 54-56.)

After her release from the hospital, Warden Tina Stump ordered Udeh to submit to a fitness-for-duty evaluation at the State Medical Director's Office due to concerns about her mental health status due to "erratic behavior." (*Id.* ¶¶ 57-58.) Plaintiff alleges that she had not been exhibiting any erratic behavior and that this representation to the State Medical Director's Office was false. She also alleges that this was Defendant's attempt to convey to the State Medical Director's Office that Defendant sought an outcome in which Plaintiff was declared unfit for work due to her mental health. (*Id.* ¶ 58.) Dr. Nwaneshiudu, a physician at the State Medical Director's Office objectively found that Udehwas healthy but still claimed that he had "concerns about her mental health status," referring her for a psychiatric evaluation for any potential workplace violence. (*Id.* ¶¶ 59-60.) Upon this referral, Udeh saw Dr. Gabriel Newman, a licensed psychologist, who evaluated her "intellectual, emotional, personality, and behavioral status with respect to fitness for work." (*Id.* ¶ 61.) Plaintiff alleges that this examination went far beyond the examination for which she was referred, and that Dr. Newman used incorrect tools for performing the assessment that Dr. Nwaneshiudu claimed to be seeking. (*Id.* ¶¶ 61-62.) Despite Dr. Newman's behavioral assessment that Udeh was a perfectly normal and healthy individual (based on her behavior, affect, and responses during assessment), Dr. Newman diagnosed her with Borderline Intellectual Functioning with intellectual disabilities, and concluded that she was functioning on an elementary school level of intelligence in mathematics, word, reading, and spelling, and at a junior high level in

5

sentence comprehension, even though she was in process of receiving her Master's Degree in Homeland Security at American University (which she subsequently completed successfully). (*Id.* ¶¶ 64-66.) Dr. Newman further concluded that "although Ms. Udeh would like to continue her work in the corrections field, it is suspected that she would not contend well with the challenges of this work." (*Id.* ¶ 68.) Plaintiff denies this conclusion and states that she does not have Borderline Intelligence Functioning. (*Id.* ¶ 70.)

Udeh also alleges that she previously applied for a job as a "Correctional Case Management Specialist Trainee." (*Id.* ¶¶ 71-72.) She was later told that she had been placed into the "Better Qualified" category for the position, putting her in the middle tier of candidates for the job. (*Id.*) Still, she was not even offered an interview for the position. (*Id.* ¶ 72.) When asked, Warden Stump allegedly told Udeh that she would never be a case manager because she is "crazy." (*Id.* ¶ 73.) Udeh also alleges that she was not paid a $750 bonus that was given to all other case managers. (*Id.* ¶ 74.)

Plaintiff was then transferred to Chesapeake Detention Facility ("CDF"), where Warden Alexander indicated that she "did not want any trouble in her jail." (*Id.* ¶¶ 75-76.) Udeh alleges that this was a reference to her track-record of reporting the frequent discrimination regarding her national origin. (*Id.* ¶ 76.) She alleges continued harassment and threats by staff at CDF, including two separate occasions on which her vehicle was tampered with, corresponding closely to key dates in Plaintiff's MCCR process. (*Id.* ¶¶ 77-78.) The first instance was two weeks before the first fact finding hearing at the MCCR, when the lug nuts on her vehicle's tire were loosened such that the tire completely fell off when she took the vehicle (which she had only owned for three months) to a mechanic to investigate the sudden

noise the vehicle was making. (*Id.* ¶ 79.) Shortly after the MCCR hearing, Plaintiff's vehicle was tampered with again. She came to her vehicle after her shift and discovered that her gas tank cover showed signs of being forcibly pried open. (*Id.* ¶ 80.) She found residue of an unknown substance when she opened the gas tank cover. (*Id.*)

Plaintiff was then transferred again, this time to the Jail Industries Building for a project manager position. (*Id.* ¶ 81.) Once there, Plaintiff was continually harassed by Major Tripp who stated "you don't belong here," used comments to both degrade her national origin and mental state, and encouraged other officers to single out and further harass her. (*Id.* ¶¶ 82-83.) Plaintiff reported this harassment to Major Tripp's supervisor, Captain Brown of CDS. (*Id.* ¶ 84.) While in the meeting with Captain Brown, a lieutenant approached Plaintiff and advised that she previously told Major Tripp to stop harassing her due to her national origin and that this message would be reiterated. (*Id.* ¶ 85.) Plaintiff was then visited and interrogated by a detective of the Internal Investigation Unit who alleged that she was causing issues within the Jail Industries Building. (*Id.* ¶ 86.) After Warden Alexander's retirement, Major Tripp intentionally reassigned Udeh back to Chesapeake Detention Facility ("CDF"), but she reported that she feared for her safety at this location, citing the two instances where her vehicle was tampered with. (*Id.* ¶¶ 87-90.) Plaintiff then attempted to meet with Deputy Commissioner Michael King to express her concerns but was not allowed to meet with him and was accused of threatening him, which she denies. (*Id.* ¶¶ 91-94.) As a direct result of her attempt to meet with the Deputy Commissioner, Udeh alleges that she was placed on administrative leave and ordered to complete another workability evaluation, even though in

the ten months since the evaluation by Dr. Newman, she had exhibited no instances where her mental status was in question and had not been further hospitalized. (*Id.* ¶¶ 95, 97- 98.)

On April 24, 2019, Plaintiff's own healthcare professional determined that she could perform all work-related tasks without restriction, but the following day Dr. Williams of the State Medical Director's office concluded that she was "unable to safely, consistently, and reliably perform her essential job duties with or without reasonable accommodations at this time," despite only finding that she felt bullied at her workplace. (*Id.* ¶¶ 99, 101.) Plaintiff was then recommended to see Dr. Patricia Jenkins for psychological evaluation, who concluded that the only problem was that she was dealing with "job-related stress and worry" because "she was being bullied on her job and treated unfairly." (*Id.* ¶¶ 103-04.) Despite Dr. Jenkins merely recommending that Plaintiff receive therapy, she was compelled to return to Dr. Williams for a follow-up examination. (*Id.* ¶ 108.) Dr. Williams found her mental status examination to be perfectly normal, but nevertheless concluded that she suffered from an "adjustment disorder with depressed mood" and that she was unable to perform her job duties. (*Id.* ¶¶ 108-10.) Udeh alleges that Dr. Williams was simply acting as an administrative extension of the Defendant, seeking to provide cover for the personnel action that the DPSCS wanted him to provide – namely, justification for firing Plaintiff." (*Id.* ¶ 111.)  Dr. Williams recommended that the agency "take appropriate administrative actions concerning [Udeh's] employment status as a Correctional Officer II." (*Id.*) On June 4, 2019, Plaintiff was banned from all correctional facilities via a poster with her photograph, which she alleges caused her great humiliation. (*Id.* ¶ 112.)

8

Plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights ("MCCR") on July 31, 2018, within 180 days of the alleged discriminatory employment practices.[2] (*Id.* ¶¶ 15-16.) Udeh subsequently supplemented those charges to include later discriminatory action including her employment termination. (*Id.* ¶ 17.) In April 3, 2020, Plaintiff received a written finding which found no probable cause. (*Id.* ¶ 18.) On April 7, 2020, she asked for reconsideration, which was denied on May 8, 2020. (*Id.* ¶¶ 19-20.) On September 28, 2020, the Equal Employment Opportunity Commission ("EEOC") mailed Udeh a Dismissal and Notice of Rights. (*Id.* ¶ 21.) She then filed this action on December 25, 2020 and has complied with all administrative prerequisites. (*Id.* ¶ 22.)

## STANDARD OF REVIEW

Defendant DPSCS moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), under which the Plaintiff's pleading is subject to dismissal if it "fails to state a claim upon which relief can be granted." Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

---

[2] Although 42 U.S.C. § 2000e-5(e)(1) requires an individual to file with the appropriate state or local agency within 180 of when "the alleged unlawful employment practice occurred," Maryland is a deferral state, therefore, a claim must instead be filed no more than 300 days after the alleged unlawful employment practice. *See Garnes v. Maryland*, No. RDB-17-1430, 2018 WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *see also Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F. App'x 256 (4th Cir. 2008). Udeh's claim was filed well within the 300-day standard.

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). A complaint need not include "detailed factual allegations." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

While ruling on a motion to dismiss, a court's evaluation is generally limited to allegations contained in the complaint. *Goines v. Calley Cmty. Servs. Bd.*, 822 F.3d 159, 166-67 (4th Cir. 2016). However, courts may also consider documents explicitly incorporated into the complaint by reference. *Id.* at 166 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In addition, a court may "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citing *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). A document is "integral" when "its 'very existence, and not the mere information it contains,

10

gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted). Considering such documents does not convert a motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). Accordingly, in ruling on Defendant's Motion to Dismiss, this Court will consider Plaintiff's MCCR Charge (Ex. A, ECF No. 10-2). *See Bowie v. Univ. of Md. Med. Sys.*, No. ELH-14-03216, 2015 WL 1499465, at *3 n.4 (D. Md. Mar. 31, 2015) ("Courts commonly consider EEOC charges as integral to a plaintiff's Complaint, *i.e.*, effectively a part of the pleading, even if the EEOC charge is not filed with the Complaint.") (citations omitted).

Defendant DPSCS also seeks dismissal under the Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based on Udeh's alleged failure to timely exhaust administrative remedies. (ECF No. 16-1 at 9.) The United States Supreme Court has held that the exhaustion requirement under Title VII is "a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019). This Court will therefore construe Defendant's claim that Udeh failed to timely exhaust her administrative remedies under Rule 12(b)(6) for failure to state a claim. *See Stewart v. Iancu*, 912 F.3d 693, 701-02 (4th Cir. 2019) (holding that dismissal for failure to comply with Title VII's 180-day waiting period requirement, which is a mandatory claim-processing rule, was appropriate under Rule 12(b)(6)); *see also Carter v. Montgomery County*, No. TDC-18-2249, 2019 WL 3804765, at *2 (D. Md. Aug. 13, 2019) (same).

## ANALYSIS

## I. Timeliness of Plaintiff's Allegations

In its Motion to Dismiss the Amended Complaint, Defendant DPSCS contends that lines 1-40 of Plaintiff's Amended Complaint are time-barred allegations that cannot be considered by this Court. Under the Civil Rights Act of 1964, a Plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory event. 42 U.S.C. § 200e-5(e)(1). On July 31, 2018, Plaintiff filed a Charge of Discrimination with the EEOC. (ECF No. 10-2). Therefore, under 42 U.S.C. § 200e-5(e)(1), any alleged event that occurred between October 4, 2017 would be outside the 300-day statutory period. Plaintiff contends, however, that under the continuing violation doctrine, all of her claims of hostile work environment based on national origin are cognizable. (ECF No. 19 at 4.)

Under the continuing violation doctrine, allegations comprising a hostile work environment charge can include events outside of the 300-day statutory period when such events are "part of the same actionable hostile work environment practice" and "at least one act falls within the [statutory] time period" since a hostile work environment claim normally "occurs over a series of days or perhaps years." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120, 122 (2002); *Gilliam v. S.C. Dept. of Juvenile Justice*, 474 F.3d 134, 140 (4th Cir. 2007); *see also White v. BFI Waste Servs., LLC* 375 F.3d 288, 292-93 (4th Cir. 2004). When multiple events over the course of a plaintiff's employment tenure have contributed to a hostile work environment, even when those events were carried out by many different people over a long period of time, this Court considers events that occurred prior to the statutory reporting period in its analysis of a hostile work environment. *Laif v. Cmty. Coll. of Balt. Cnty.*, No. RDB-05-2648, 2008 WL 8910650 at *8-*9 (D. Md. Aug. 19, 2008). In *Laif*, a professor who charged his

employer with a hostile work environment based on national origin was the subject of harassment from multiple students, some anonymous, over the course of his employment at defendant's community college. *Id.* These incidents, which were reported to various members of the school administration, were all included as part of this Court's ruling on summary judgement, even though some of the earliest incidents occurred outside the statutory period. *Id.*

In this case Udeh has sufficiently pled that all of the events that led to her claim of a hostile work environment were part of the same "actionable hostile work environment practice" and that at least one of the acts fell "within the statutory period." *Morgan*, 536 U.S. at 120, 122. She alleges that starting in June 2015, she experienced harassment via derogatory comments such as "African bitch," "Go back to Africa," and "Y'all Africans came from your country to steal our jobs in America" (ECF No. 13 ¶ 27), and that similar comments were alleged during the statutory period, such as Plaintiff being criticized as "not American enough" in December 2017 (*id.* ¶ 13). Plaintiff further alleges that the original derogatory comments, although they started in 2015, were not confined to that year and continued throughout her employment with Defendant. (ECF No. 13 ¶ 27; ECF No. 19 at 5-6.) At this stage in the proceedings, Udeh has sufficiently alleged a pattern of instances perpetrated by various coworkers and reported to various supervisors throughout her tenure of employment.

II. **Plaintiff's Claim of National Origin-Based Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (Count I)**

In Count I of her Amended Complaint, the Plaintiff alleges discrimination on the basis of national origin, in violation of Title VII of the Civil Rights Act of 1964. (ECF No. 13.) A

13

hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a Title VII claim for hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's [national origin]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)). In its Motion to Dismiss, Defendant contends that Plaintiff has failed to sufficiently plead a *prima facie* case of national origin discrimination because she has not alleged sufficient facts to meet the second or third prongs of Title VII: conduct based on plaintiff's national origin and conduct sufficiently severe or pervasive to alter the plaintiff's conditions of employment, respectively. (ECF No. 16 at 13, 17.) However, this Court is satisfied that Plaintiff has sufficiently alleged a *prima facie* case of national origin discrimination.

First, Plaintiff has sufficiently alleged that she was, on multiple occasions, harassed at work due to her national origin. *See Iqbal*, 556 U.S. at 663. As detailed above, she alleges that she was frequently subject to harassment based on national origin during a three-and-a-half-year period of employment at DPSCS. (ECF No. 13 ¶ 27.) She also alleges that coworkers and supervisors used derogatory comments such as "African bitch," "Go back to Africa," and "Y'all Africans came from your country and come steal our jobs here in America." (*Id.*) Further, she alleges that on December 31, 2017, Captain Jones criticized her of not being "American enough," a clear reference to her national origin as being outside of the United

States. (*Id.* ¶ 44.) This type of behavior was allegedly confirmed as typical by other employees from other African countries, including Nigeria, when they advised Udeh to "just manage it, because they pick on all of us." (*Id.* ¶ 29.) Further, Defendant appears to concede that at least some of the actions alleged were motivated by her national origin. (ECF No. 16 at 14.)

Second, Udeh has sufficiently alleged that harassment by Defendant's employees was severe and pervasive in satisfaction of the third element of the *prima facie* Title VII claim. To determine the severity of a hostile work environment, the courts look at the totality of the circumstances, which include: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonable interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Conduct must be severe and pervasive enough to create an environment that is both objectively hostile to a "reasonable person" and has been subjectively perceived as hostile by the victim. *Id.* at 21-22; *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). As the Defendant aptly notes, the Fourth Circuit has set a "high bar" for severity and pervasiveness, noting that the conduct must be so extreme as to amount to a change in the terms and conditions of employment, as opposed to "simple teasing, offhand comments, and isolated incidents" *Sunbelt*, 521 F.3d at 315 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Nevertheless, although the bar set by the Fourth Circuit is high, the Plaintiff has alleged conduct sufficient to clear that bar at the Motion to Dismiss stage. Plaintiff alleges, *inter alia*, being called out for her national origin (ECF No. 11 ¶ 27); being told by coworkers that she should "just manage" conduct by her American-born colleagues (*Id.* ¶ 29); being consistently

15

teased by her American coworkers (*Id.* ¶ 30); having death threats written about her to her superiors (*Id.* ¶ 41); having her vehicle tampered with (*Id.* ¶ 78-80); and being criticized as not being "American enough" (*Id.* ¶ 44). Further, Plaintiff clearly alleges that she subjectively perceived the environment as hostile, as evidenced by the fact that she made complaints. (*Id.* ¶ 32.) Finally, while the Supreme Court has made clear that workplace harassment does not need to be so severe and pervasive as to drive a victim to have a "nervous breakdown" in order to allege a Title VII claim, Plaintiff *has* alleged that Defendant's employees actions drove her to be hospitalized twice as a result of her feeling overwhelmed and stressed to the point of losing consciousness at work, thereby surpassing the threshold that the Supreme Court set. *See Harris*, 510 U.S. at 22 ("Title VII comes into play before the harassing conduct leads to a nervous breakdown"). Udeh's allegations are sufficient.

### III. Plaintiff's Claim of Retaliation in Violation of Title VII of the Civil Rights Act of 1964 (Count II)

In Count II of her Amended Complaint, Plaintiff alleges that Defendant retaliated against Plaintiff after she made formal and informal complaints to Defendant, opposing Defendant's employment practices based on her national origin. (ECF No. 13 ¶¶ 134-35.) "The substantive provision [of Title VII] seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). To maintain a Title VII retaliation claim, Udeh must establish that (1) she engaged in activity protected under the statute; (2) she suffered a "materially adverse" act at

the hands of the employer; and (3) the employer's act was causally related to the protected activity. *White*, 548 U.S. at 61.

An employee can engage in a protected activity by filing a formal complaint against her employer, or by simply voicing her own opinions in order to bring attention to an employer's discriminatory activities, as well as "complaints about suspected violations." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005) (citing *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536-543-44 (4th Cir. 2003)). With respect to what constitutes a "materially adverse" act at the hands of an employer, the category in retaliation claims is not "limited to discriminatory actions that affect the terms and conditions of employment." *White*, 548 U.S. at 64, 67-68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). A plaintiff need only show that an employer's actions would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* There is no dispute that Udeh engaged in at least one protected activity and that she suffered at least one adverse employment action: she filed a formal complaint with the EEOC and was terminated from her position with the Defendant. However, there is some disagreement between the parties as to whether any of Udeh's informal complaints against Defendant constituted protected activity and whether other actions of Defendant constituted adverse employment actions. Such disputes impact this Court's analysis with respect to the third element of the *prima facie* case for retaliation: the causal link.

The Supreme Court has articulated a strict but-for causation standard for retaliation claims. *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To establish such

but-for causation, plaintiffs may show that the adverse act bears sufficient temporal proximity to the protected activity. *See, e.g., Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). The Supreme Court and the Fourth Circuit have repeatedly emphasized that temporal proximity must be "very close" to show a causal connection. *Id.* On this reasoning, the Fourth Circuit has rejected gaps of as little as two months. *Horne v. Reznick Fedder & Silverman*, 154 Fed. App'x. 361, 364 (4th Cir. 2005); *see also Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. App'x. 229, 233 (4th Cir. 2006) (rejecting a gap of three to four months). However, in cases where the temporal proximity is "missing," "courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.,* 478 F.3d 640, 650 (4th Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000)).

Defendant DPSCS contends that Udeh has not sufficiently alleged causation based on temporal proximity, and therefore failed to allege a retaliation claim, because the time between her formal EEOC complaint (January 12, 2018) and her termination (June 20, 2019) exceeded eighteen months, well beyond the two-month limit imposed by the Fourth Circuit. (ECF No. 16 at 25.)  In arriving at this conclusion, Defendant relies only on Udeh's formal complaint to EEOC as a cognizable "protected action" and Udeh's termination as a cognizable "adverse employment action." (*Id.*)

However, Udeh alleges a number of additional potentially protected actions which could be included to make a *prima facie* case for retaliation including, *inter alia*, multiple complaints to supervisors, an internal grievance filed with the EEO office, and a fact-finding hearing. Defendant further relies only on Udeh's termination as a cognizable "adverse employment action." But given that an adverse employment action is any action that would

18

"dissuade a reasonable worker from making or supporting a charge of discrimination," Udeh also alleges being repeatedly accused of sexual misconduct, being subjected to medical examinations and having her car tampered with. (ECF Nos. 13 ¶¶ 79-80, 19 at 15-16.) If the only protected activities and adverse employment actions were those conceded by Defendant (Udeh's formal complaint and termination respectively), then she may not be able to prove the causal link based on temporal proximity. However, since Udeh has made a number of allegations in both the protected activity and adverse employment action categories, calculating temporal gaps of anywhere from three weeks to two months (ECF No. 19 at 17), all within the temporal proximity definition set by the Fourth Circuit, Udeh's allegations for a retaliation claim are sufficient.

Additionally, while Defendant aptly notes that eighteen months passed between Udeh's EEOC complaint alleging discriminatory treatment and Udeh's termination, certain intervening events may demonstrate plausible "retaliatory animus." (*See, e.g.*, this Court's opinion in *Bowman v. Balt. City Bd. Sch. Comm'rs*, 173 F. Supp. 3d 242, 250 (D. Md. 2016)). For example, Udeh claims that she was transferred to MRDCC (ECF No. 13 ¶ 51); ordered to submit to a fitness test (*id.* ¶ 57); didn't get interviewed for a management specialist position for which she was qualified (*id.* ¶ 71-72); had her vehicles tampered with (*id.* ¶¶ 78-80); was interrogated by members of the Internal Investigation Unit (*id.* ¶ 86); and reassigned to Chesapeake Detention Center against her will (*id.* ¶ 88), all after she made her formal discrimination complaint. Each adverse action alleged was plausibly in retaliation for either her January 12th EEOC complaint or one of the other complaints that she made to her supervisors for harassment (*see e.g., id.* ¶¶ 78-80, 84, 90). Accordingly, Udeh has alleged facts

19

so show a sufficient causal link between her protected activity and DPSCS's adverse employment action. *See Bowman*, 173 F. Supp. 3d at 250 (finding that although Plaintiff's direct complaint and administrative leave were three months apart, Plaintiff sufficiently pled retaliation by alleging intervening events that demonstrated retaliatory animus including being relieved of certain duties and receiving negative comments about her job performance).

## CONCLUSION

For the foregoing reasons, Udeh has adequately alleged a claim for relief in both counts of her Amended Complaint. Accordingly, Defendant DPSCS's Motion to Dismiss (ECF No. 16) is DENIED.

A separate Order follows.

Dated: July 26, 2021

                                                                                                                                                             /s/
                                        Richard D. Bennett
                                        United States District Judge